# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YOLANDA PAULING,

        Plaintiff,

        v.

DISTRICT OF COLUMBIA,

        Defendant.

Civil Action No. 13-943 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Yolanda Pauling, an African-American woman currently employed as a Senior Crime Analyst with the District of Columbia Metropolitan Police Department ("MPD"), initiated this action against defendant District of Columbia alleging employment discrimination on the basis of race, gender, and disability; retaliation; hostile work environment; and failure to accommodate a disability in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*; the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*; Title I of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12111 *et seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[1] Pending before the Court is the defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 43, on all counts. For the reasons explained below, the defendant's motion is granted.

---

[1] The plaintiff's complaint also included claims of employment discrimination on the basis of race and retaliation against the District of Columbia, under 42 U.S.C. §§ 1981 and 1983, *see* Amended Compl. ¶¶ 179–216, ECF No. 14, but those claims were voluntarily dismissed by the plaintiff earlier in this litigation, *see* Pl.'s Notice of Filing ("Pl.'s Notice") at 1, ECF No. 22.

## I.    BACKGROUND

The plaintiff has been employed with MPD since at least October 3, 2005, when she was a Grade 9, Step 1 Crime Analyst.  Def.'s Statement Undisputed Facts Supp. Mot. Summ. J. ("Def.'s SMF") ¶ 3, ECF No. 43-2 (undisputed); Def.'s Mot., Ex. 3, Pl.'s Probationary Evaluation ("Probationary Evaluation"), ECF No. 54-1 at 16.[2]  On August 15, 2010, she was promoted from a Grade 11, Step 3 position to a Grade 12, Step 1 position, which included a $9,455 annual salary increase.  Def.'s SMF ¶ 4; Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 1, ECF No. 46-1; Def.'s Mot., Ex. 4, Notification of Personnel Action ("Personnel Action"), ECF No. 54-1 at 19.  In 2012, she was promoted to a Senior Crime Analyst, in which position she remains today.  Pl.'s Opp'n at 1; Pl.'s Opp'n, Ex. 26, Deposition of Yolanda Pauling ("Pl.'s Dep.") at 4, ECF No. 47-11.  The plaintiff maintains workstations at the MPD Headquarters office and at the Fourth District office.  Amended Compl. ("Compl.") ¶ 16, ECF No. 14.

The plaintiff's troubles appear to have started in 2010, after a workplace incident caused her to suffer chronic back pain.  The facts associated with that incident, as well as the plaintiff's subsequent requests for accommodations, are detailed below.

### A.    The March 2010 Incident and Subsequent Requests for Accommodations

Since 2010, the plaintiff has suffered "spasms of the neck and back as well as nerve damage which causes her to experience chronic pain."  Pl.'s Opp'n at 1.  These conditions are allegedly the result an injury the plaintiff sustained on March 18, 2010, when her coworker,

---

[2]    The parties filed many exhibits, with multiple duplicates, with their memoranda in support of and in opposition to the instant motion.  Although each exhibit and submission from the parties has been reviewed, only those exhibits necessary to provide context for resolution of the instant motion are cited herein.  In addition, the defendant's exhibits in support of its Motion for Summary Judgment were filed in a single document appearing at ECF No. 54-1, and the plaintiff's Exhibit 15 includes many separate documents filed as one file appearing at ECF No. 46-16.  For ease of review, page number citations to these combined set of exhibits reference the ECF page number, not the page number of the individual exhibits.

Tracy Parker, "pulled on the back of [her] chair, while she was using it, causing Ms. Pauling to suffer a whiplash effect throughout her spinal column." *Id.* at 1–2. The plaintiff testified to an MPD investigator that she immediately went to see her supervisor, Raymond Wickline, after the incident. Def.'s Mot., Ex. 10, Memorandum from MPD Command Info. Ctr. to MPD Ass't Chief of Police ("MPD Investigation Memo"), ECF No. 54-1 at 60. The plaintiff stated that Wickline "tried to offer some comfort and offered a seat" and that when she went into his office she was "shaking and almost crying." *Id.*; *see also* Pl.'s Dep. at 23. The plaintiff further testified that Wickline "did not offer [ ] any medical attention at that time, nor did he fill out a risk management report." Pl.'s Dep. at 23. According to Wickline, he "asked if she was okay and if she needed a doctor." MPD Investigation Memo, ECF No. 54-1 at 57. The plaintiff then left work to go to the hospital and, as a result of her injury, took disability leave for the next three months, until June 14, 2010. Pl.'s Opp'n at 2; Pl.'s Opp'n, Ex. 37, Email from Pl. to Wickline, March 19, 2010 ("3/19/10, 5:10 p.m. Email"), ECF No. 47-22 at 1.[3]

Around one week after the incident, the plaintiff asked Wickline for the status of her worker's compensation request. Pl.'s Opp'n, Ex. 38, Email from Pl. to Wickline, March 23, 2010 ("3/23/10, 9:09 a.m. Email"), ECF No. 47-23 at 4. Wickline informed the plaintiff that he had "call[ed] in an initial report" and had "asked for statements from those involved or who were witness to the incident," but that he was away on vacation and any further paperwork would be delayed until his return. Pl.'s Opp'n, Ex. 38, Email from Wickline to Pl., March 23, 2010 ("3/23/10, 9:46 a.m. Email"), ECF No. 47-23 at 3. The next day, the plaintiff emailed MPD

---

[3] The parties have submitted many identical exhibits in their moving and responsive papers and, for ease of review, citations to the parties' exhibits will identify the docket number where the referenced section may be found rather than the exhibit number. The parties have also submitted many emails as exhibits, often in files that contain more than one email. Citations to emails will identify the date and time of the email, as well as the docket number in which the referenced email may be found.

Assistant Chief Alfred Durham, Jr., to request his assistance with "instituting an adequate investigation and the enforcement of the necessary paperwork" related to her accident and her request for worker's compensation. Pl.'s Opp'n, Ex. 37, Email from Pl. to Alfred Durham, March 24, 2010 ("3/24/10, 1:13 p.m. Email"), ECF No. 47-22 at 2.

In April 2010, the plaintiff allegedly requested an accommodation for her disability. Specifically, in a later-filed Charge of Discrimination with the District of Columbia Office of Human Rights ("OHR"), the plaintiff averred that in April 2010 she "requested an ergonomic assessment for [her] dual workstations" at the Fourth District and Headquarters offices; "a foot stand; a glare-reducing computer monitor; ergonomic chairs; an ergonomic mouse; a headset; and a walking cane." Def.'s Mot., Ex. 1, Pl.'s OHR Charge of Discrimination ("OHR Compl."), ECF No. 54-1 at 6. The plaintiff also asked to be transferred to an office location with an elevator, as the Fourth District did not have one, and to be able to work from home. *Id.* On April 14, 2010, a doctor with the District of Columbia Office of Risk Management ("ORM") Disability Compensation Program completed a report of the plaintiff's injury and disability. Pl.'s Opp'n, Ex. 30, Plaintiff's Medical Records ("Medical Records"), ECF No. 52-1 at 3. The report recommended an ergonomic chair and physical therapy and was accompanied by a prescription for an "ergonomic assessment—chair, keyboard, foot stand." *Id.* at 4–5. On April 22, 2010, a different physician completed a second report, noting that the plaintiff was instructed to work from home from May 10, 2010, until May 14, 2010. *Id.* at 6–7. That same day, the plaintiff emailed Wickline several forms that she averred had to be completed by Wickline for her worker's compensation request. Def.'s Mot., Ex. 7, Email from Pl. to Wickline, April 22, 2010 ("4/22/10, 12:28 p.m. Email"), ECF No. 54-1 at 48.

On May 10, 2010, Wickline emailed the plaintiff after he learned she was planning her return to work. Def.'s Mot., Ex. 7, Email from Wickline to Pl., May 10, 2010 ("5/10/10, 10:40 a.m. Email"), ECF No. 54-1 at 48. He informed her that "[a]ll plans to work from home must be approved by the supervisor ahead of time" and that "[a]ny time you are out for more than 3 days, a Doctor's note must be made available to your supervisor to ensure you are cleared to return." *Id.* He also noted that he was waiting for her to send him certain forms and that once she returned, they would have additional forms to complete. *Id.* Finally, Wickline acknowledged that he had heard the plaintiff's doctor "ha[d] prescribed an ergonomic chair, and noted that "[i]f this is the case, I need to get a copy of that paperwork as well so we can start a procurement on the necessary equipment." *Id.* In response, the plaintiff sent forms that she claimed to have sent "weeks ago" and noted that she would forward a copy of her doctor's note. Def.'s Mot., Ex. 6, Email from Pl. to Wickline, May 10, 2010 ("5/10/10, 1:58 p.m. Email"), ECF 54-1 at 46. She also claimed that she had been "ordered by [her] doctor to work from home for recovery purposes" and that if Wickline had any questions, he could contact her doctor directly. *Id.* The plaintiff appears to have sent "a copy of the doctor's order for an ergonomic assessment for equipment" to Wickline later that day. Pl.'s Opp'n, Ex. 15, Email from Pl. to Wickline, May 10, 2010 ("5/10/10, 11:48 p.m. Email"), ECF No. 46-16 at 2.

The next day, Wickline responded to the plaintiff, asking her to "just stop and listen for a second." Def.'s Mot., Ex. 8, Email from Wickline to Pl., May 11, 2010 ("5/11/10, 6:38 a.m. Email"), ECF No. 54-1 at 50. He stated that she had sent these forms to him "many, many, many times," but that he had "already filled them out and made copies available to everyone who has wanted or needed one." *Id.* He noted that he was still waiting for her to provide a completed "F1 form" for his signature, an indication "of when you plan to return to work," and "[a] copy of

a Doctor's note clearing you to return to work." *Id.* Wickline also clarified that if the plaintiff intended to work from home, she needed to "submit a plan for what you will be doing and I need to approve this ahead of time per branch policy." *Id.* As for the plaintiff's prescription for an ergonomic assessment, Wickline explained that MPD "do[es] not provide assessments for medical needs" but that, if the prescription identified the equipment she needed, he would "see when the equipment will be available." *Id.*

On May 12, 2010, the plaintiff sent her completed "Form 1" to Wickline and told him that she would send him a copy of her doctor's order. Pl.'s Opp'n, Ex. 15, Email from Pl. to Wickline, May 12, 2010 ("5/12/10, 7:25 p.m. Email"), ECF No. 46-16 at 39. She also asked Wickline to send her the "standard form that I need to fill out for my request to work from home." *Id.* Wickline responded that "Form 3" still needed to be filled out by her physician and needed to be accompanied by a doctor's note clearing her to return to work. Pl.'s Opp'n, Ex. 15, Email from Wickline to Pl., May 13, 2010 ("5/13/10, 11:02 a.m. Email"), ECF No. 46-16 at 39. He then informed the plaintiff that "there are no standard forms for requesting working from home" but that "a plan must be submitted detailing what will be accomplished, why it needs to be accomplished from home and a plan for monitoring the accomplishments. That plan must be approved by the supervisor before an employee can work from home." *Id.* He also expressed concern that "if your health will not permit you to sit at a desk and work on a computer at an MPD location, then sitting at a desk and working on a computer at home is not going to be good for your back either." *Id.*

On June 11, 2010, the plaintiff emailed Commander James Crane informing him that she was "in the process of getting clearance from [her] doctor to return to work on Monday, June 14, 2010." Pl.'s Opp'n, Ex. 36, Email from Pl. to Crane, June 11, 2010 ("6/11/10, 10:59 a.m.

Email"), ECF No. 47-21 at 1.  In her email, she reminded Crane of certain requests she had previously made in a phone interview with him: that she be accommodated with a "safe environment," that her "manager and coworker need to be held accountable for their actions to prevent future work place violence incidents," that she be able to "work at a location that has an elevator," that she receive "[s]pecialized equipment to accommodate [her] back injury," that her sick leave hours be restored, and that she "not work in a hostile work environment and [ ] not be a victim of work retaliation," among other requests.  *Id.*  Crane responded later that day, informing her that she needed to provide "a doctor's note specifying what equipment is needed as well as appropriate worker's comp paperwork clearing the return to work."  Pl.'s Opp'n, Ex. 36, Email from Crane to Pl., June 11, 2010 ("6/11/10, 4:15 p.m. Email"), ECF No. 47-21 at 1. He also instructed her to report to the Crime Analysis office at Headquarters, as that location had an elevator.  *Id.*

Around June 22, 2010, the plaintiff filed an internal EEO complaint alleging that MPD had failed to accommodate her disability.  Def.'s SMF ¶ 11 (undisputed).  According to the plaintiff's later-filed OHR Charge of Discrimination, that complaint also included allegations "about the office horseplay, the offensive environment and also about the lack of disability accommodations."  OHR Compl., ECF No. 54-1 at 6.

On June 25, 2010, the plaintiff forwarded her doctor's notes to Alphonso Lee, an EEO Counselor with MPD.  Def.'s Mot., Ex. 10-A, Email from Pl. to Lee, June 25, 2010 ("6/25/10, 10:17 a.m. Email"), ECF No. 54-1 at 68.  In response, Lee asked the plaintiff whether her doctor had given her an ergonomic evaluation and, as Wickline had previously done, notified her that the evaluation was "[her] responsibility to obtain."  Def.'s Mot., Ex. 10-A, Email from Lee to Pl., June 25, 2010 ("6/25/10, 10:22 a.m. Email"), ECF No. 54-1 at 68.  After the plaintiff stated that

she had not received an ergonomic evaluation and that she "wasn't aware that [she] was responsible for this because this incident occurred at work," Def.'s Mot., Ex. 10-A, Email from Pl. to Lee, June 25, 2010 ("6/25/10, 10:23 a.m. Email"), ECF No. 54-1 at 67–68, Lee clarified that "[t]he ergonomic assessment can only be done if your doctor indicates specifically what you need" and that the document she had provided "d[id] not indicate any specific accommodation needed," Def.'s Mot., Ex. 10-A, Email from Lee to Pl., June 25, 2010 ("6/25/10, 10:32 a.m. Email"), ECF No. 54-1 at 67. The plaintiff responded that, in her understanding, "once the ergonomic evaluation is done, this would encompass the necessary equipment that is needed," and asked for an update on the status of her EEO investigation. Def.'s Mot., Ex. 10-A, Email from Pl. to Lee, June 25, 2010 ("6/25/10, 10:43 a.m. Email"), ECF No. 54-1 at 67. Lee informed the plaintiff that her assault allegation was being investigated and that her "other concerns did not meet the elements of [a] prima facie case under EEO laws." Pl.'s Opp'n, Ex. 40, Email from Lee to Pl., June 25, 2010 ("6/25/10, 10:52 a.m. Email"), ECF No. 47-25 at 6.

On July 13, 2010, Lee checked in on the plaintiff, asking whether her workstation ergonomic assessment had been "conducted and formalized to determine what accommodations" she needed. Pl.'s Opp'n, Ex. 40, Email from Lee to Pl., July 13, 2010 ("7/13/10, 3:24 p.m. Email"), ECF No. 47-25 at 5. The next day, the plaintiff responded that no assessment had been performed and that "nothing has been done by [her] management and staff." Pl.'s Opp'n, Ex. 40, Email from Pl. to Lee, July 14, 2010 ("7/14/10, 7:47 a.m. Email"), ECF No. 47-25 at 6. She also asked, again, about her pending investigation, *id.*, and Lee stated he would "contact with Human Resources and assist them in carrying out your ergonomic assessment of your workstation to prevent any delay," Pl.'s Opp'n, Ex. 40, Email from Lee to Pl., July 14, 2010 ("7/14/10, 4:49 p.m. Email"), ECF No. 47-25 at 5.

Two days later, on July 16, 2010, Lee asked the plaintiff to fill out a Reasonable Accommodation Request Form "in order to accurately determine what accommodations are needed per your physician's direction" and clarified that her doctor should fill out that form. Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., July 16, 2010 ("7/16/10, 10:38 a.m. Email"), ECF 46-16 at 47; Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., July 16, 2010 ("7/16/10, 1:27 p.m. Email"), ECF No. 46-16 at 46–47. In response, the plaintiff asked for an "explanation as to why the ergonomic assessment was not processed timely." Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, July 16, 2010 ("7/16/10, 5:32 p.m. Email"), ECF No. 46-16 at 46. Lee responded that "the necessary steps have been put in place to have your ergonomic assessment/evaluation completed pending your physician's explanation of what your disability needs in order to perform your essential job duties." Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., July 19, 2010 ("7/19/10, 8:35 a.m. Email"), ECF No. 46-16 at 46. According to Lee, the plaintiff had provided to him and to Human Resources "the same document that only request [sic] the ergonomic assessment, but not the actual reasonable accommodation (i.e. chair, stand etc.) that your physician deems necessary. You also stated that you have not informed your supervisor, Mr. Wickline, specifically on what items are needed to perform your essential job duties." *Id.* Lee noted that "[u]pon submission of the Reasonable Accommodation Form, there will be a timely ergonomic assessment." *Id.*

In two successive emails to Lee, the plaintiff took issue with these statements, stating that she had "submitted previous documentation to HR and [Wickline] regarding the necessary equipment needed," Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, July 19, 2010 ("7/19/10, 9:06 a.m. Email"), ECF No. 46-16 at 45, and that Lee's July 16, 2010, email "was the first time [she] had been put on notice and aware that the Reasonable Assessment Request Form was needed in order to start the process for the evaluation and/or equipment necessities," Pl.'s Opp'n, Ex. 15,

Email from Pl. to Lee, July 19, 2010 ("7/19/10, 9:29 a.m. Email"), ECF No. 46-16 at 45. The plaintiff further averred that "[t]his is why I have filed with the EEO regarding my claim [Racial Discrimination, Hostile Work Environment, HIPPA Violation, Disciplinary Action, Work Place Violence and Harassment] because my management staff has neglected to follow proper protocol and procedures. Instead of them investigating and handling the case/incident they have made it very difficult for me to recuperate and work in a safe and secured environment." 7/19/10, 9:29 a.m. Email, ECF No. 46-16 at 45 (brackets in original).

On July 26, 2010, the plaintiff filled out a Reasonable Accommodation Request Form, requesting an "[e]rgonomic evaluation 'station' to accommodate computer, desk, chair w/ armrest, foot rests, phone (head set), ergonomic mouse, tracking mat, monitor proper position w/ screen to reduce glare; cane." Def.'s Mot., Ex. 13, Reasonable Accommodation Request Form, July 26, 2010 ("July 2010 Accommodation Request"), ECF No. 54-1 at 75. On September 17, 2010, the plaintiff followed up with Sharon Vaughan-Roach, MPD's Diversity Manager, asking for "the status of the ergonomic assessment evaluation for which was requested since May/June 2010." Def.'s Mot., Ex. 14, Email from Pl. to Vaughan-Roach, Sept. 17, 2010 ("9/17/10, 9:58 a.m. Email"), ECF No. 54-1 at 77. The same day, Vaughn-Roach responded that, "[a]s previously stated in several prior email correspondences, once I receive official documentation from your doctor . . . stating the degree of your impairment (i.e. whether it is a disability and if it is temporary or permanent) then an ergonomic assessment may be conducted if warranted." Def.'s Mot., Ex. 14, Email from Vaughan-Roach to Pl., Sept. 17, 2010 ("9/17/10, 10:20 a.m. Email"), ECF No. 54-1 at 77.

On October 3, 2010, the plaintiff's colleague Brandy Cramer emailed a group of employees including the plaintiff informing them that "[i]f anyone else in the office is requiring

10

special accommodations in regards to chairs, etc.  Please let me know and I will forward the contact information to you in order to go through the formal process and get a chair to meet your needs specifically."  Pl.'s Opp'n, Ex. 32, Email from Cramer to Pl., *et al.*, Oct. 3, 2010 ("10/3/10, 3:22 p.m. Email"), ECF No. 47-17 at 15.  The plaintiff immediately responded that she was requesting a chair.  Pl.'s Opp'n, Ex. 32, Email from Pl. to Cramer, Oct. 3, 2010 ("10/3/10, 3:25 p.m. Email"), ECF No. 47-17 at 15.  Cramer then asked whether the plaintiff needed her to send the contact information or if she "already ha[d] it in the works."  Pl.'s Opp'n, Ex. 32, Email from Cramer to Pl., Oct. 3, 2010 ("10/3/10, 3:35 p.m. Email"), ECF No. 47-17 at 15.  It is unclear whether the plaintiff responded, but Cramer later explained that the "[f]irst step is to create a memo specifying what and why with a letter from you [sic] doctor."  Pl.'s Opp'n, Ex. 33, Email from Cramer to Pl., Oct. 3, 2010 ("10/3/10, 3:40 p.m. Email"), ECF No. 47-18 at 1.

On October 12, 2010, the plaintiff wrote to her supervisor and several other MPD officials, formally requesting a transfer from the Crime Analysis Division to the Intelligence Section Division, "[d]ue to the workplace incident that resulted in [her] back injury that occurred on March 18, 2010 at MPD headquarters and the refusal of reasonable accommodations for the necessary equipment for [her] medical condition."  Pl.'s Opp'n, Ex. 35, Employee Transfer Request ("Transfer Request"), ECF No. 47-20 at 4.  According to the plaintiff, the open position in the Intelligence Section Division to which she applied was eventually filled by Daniel Hall, a junior analyst whom the plaintiff, a senior analyst, had trained.  Pl.'s Dep. at 77.

On October 15, 2010, Lee submitted an "Exit Letter" to OHR summarizing his final counseling interview with the plaintiff and stating the EEO office's determinations.  Def.'s Mot., Ex. 15, Exit Letter to D.C. Office of Human Rights ("OHR Exit Letter"), ECF No. 54-1 at 79.  As to the March 18, 2010, "alleged 'assault,'" the EEO office determined that "[t]his is a

criminal matter and not administrative" and noted that Commander Crane was overseeing an investigation of that incident. *Id.* Her claims of an "alleged delay in filing worker's compensation" and of an "alleged HIPPA law violation" were deemed "not [ ] EEO matter[s]," and her retaliation claim was "a Labor Department issue and not an EEO matter." *Id.* As for her claims that she would be disciplined for her actions, the EEO office noted that "Ms. Pauling is alleging that she *may* get reprimanded because of her complaints" but that "[s]he indicated as of present she has suffered no adverse action." *Id.* (emphasis in original). Finally, the EEO office stated that the plaintiff's reasonable accommodation claim was "currently being addressed by the MPD pending Ms. Pauling's Physician's communication that she has a temporary or permanent disability." *Id.*

In November 2010, Wickline allegedly offered the plaintiff two ergonomic chairs, both of which she declined. Pl.'s Dep. at 35–37. She rejected the first chair because it "had feces on it." *Id.* at 35. According to the plaintiff, that chair "had a hazardous sign sitting in the back of the office," "it sat in there for about a month," and "you could smell it when you came in the office." *Id.* at 37. On December 2, 2010, the plaintiff called the Occupational Safety and Health Administration ("OSHA") to have the chair removed, and OSHA's subsequent report indicated that a "Soiled Chair" had been "removed and placed in the dumpster." Pl.'s Dep. at 37; Pl.'s Opp'n, Ex. 23, Letter from Thomas Herbert (OSHA) to Edson Ogunshakin (Dep't of Real Estate Servs.) ("OSHA Inspection Report"), ECF No. 47-8 at 2. The plaintiff stated that she rejected the second chair because it was "unsanitized" and because "the same person who made feces at work" had previously used that chair. Pl.'s Dep. at 35–36. The plaintiff testified that when Wickline provided this second chair to her, he told her, "Here's a chair for you. The one over

there, Steve had a accident in it. Ha, ha, ha," and told her that "if you take this chair, you've just got to clean it off." *Id.* at 35.

On December 30, 2010, the plaintiff filed a complaint with OHR alleging that MPD had discriminated against her on the basis of race, gender, and disability; had retaliated against her for protected activity; and had failed to accommodate her disability. Def.'s SMF ¶ 1 (undisputed); OHR Compl., ECF No. 54-1 at 5–6. Specifically, the plaintiff claimed that Wickline had allowed male employees "to pass around lewd photos, hang a swastika in the office, and to joke around about 'right wing power.'" OHR Compl., ECF No. 54-1 at 5. She alleged that after she returned to work from disability leave, "[her] supervisor and coworkers were giving [her] the silent treatment and began to exclude [her] from staff meetings and data sharing." *Id.* She also mentioned that Wickline had given her "an ergonomic desk chair that had been soiled and told [her] to clean the chair," after first providing her with "a feces-stained ergonomic chair." *Id.* Finally, she claimed that white employees who had made similar accommodation requests received their accommodations without delay, and that after filing her EEO complaint, she had "suffered a silent treatment" in the office and had her "workload increasingly diverted to a white, male colleague." *Id.* at 6.

In August 2011, the plaintiff designated a union representative and her union completed a "Member's Data Intake" report. Pl.'s Opp'n, Ex. 15, Member's Data Intake ("Union Report"), ECF No. 46-16 at 23. In her narrative, the plaintiff explained that she was "filing a grievance based on the premises that I have requested to be transferred (detailed) to work in the Criminal Intelligence Unit, since I filed a complaint against my management staff in 2010 because I am being subjected to work in a hostile and retaliatory work environment." *Id.* In that report, she resubmitted her request for a transfer to the Intelligence Division. *Id.*

On January 3, 2012, OHR issued a final determination on the plaintiff's complaint, finding probable cause as to only her reasonable accommodation claim. Def.'s SMF ¶ 2; Def.'s Mot., Ex. 2, Determination on Respondent's Request for Reconsideration ("OHR Final Decision"), ECF No. 54-1 at 12–13. OHR concluded that probable cause existed for her reasonable accommodation claim, based on "several communications" by the ADA coordinator with Complainant and Complainant's doctor "to determine whether Complainant's disability was temporary or permanent in nature." *Id.* at 12. The "Complainant's doctor notes that, in accordance with her restrictions, she should use an ergonomic chair and limit both walking and standing," but "Respondent did not timely provide Complainant information on Respondent's formal and informal procedures for requesting an accommodation." *Id.* In addition, OHR found that "[t]he Supervisory Analyst's testimony and corroborating e-mails indicate that the ergonomic chair had been selected without any consultation with Complainant as to whether it matched her documented medical need." *Id.* As for the other claims, OHR determined that the "hostile work environment allegations do not show a connection with her protected classes of race, sex and disability," that "there is no showing of the severity and pervasiveness for a hostile environment," and that the plaintiff had "fail[ed] to produce evidence" relevant to her retaliation claim. *Id.* at 13.

**B.      Requests for Accommodations after the OHR Determination**

Little activity is documented in the record until June 6, 2012, when the plaintiff again reached out to Lee to ask about the "status of [her] reasonable accommodations that was requested two years ago." Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, June 6, 2012 ("6/6/12, 10:48 a.m. Email"), ECF No. 46-16 at 69. Lee responded that he would "re-contact the necessary parties responsible for conducting the ergonomic evaluations" and he also asked if the plaintiff was "aware of any specific items you need for your workstation that can be ordered that

have not been provided to you as of yet?"  Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., June 6,

2012 ("6/6/12, 11:14 a.m. Email"), ECF No. 46-16 at 68.  The plaintiff did not respond with

specific items but rather forwarded Lee a copy of a "Reasonable Accommodation Request Form

that was submitted to [his] office on November 4, 2010," and also informed him that she had not

yet had an ergonomic evaluation.  Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, June 7, 2012

("6/7/12, 10:34 a.m. Email"), ECF No. 46-16 at 68.

On June 11, 2012, Lee informed the plaintiff that she had been granted the "alternative

reasonable accommodation of Telecommuting" and instructed her to "contact Captain Lamont

Coleman, the Telecommuting Coordinator, to ascertain the appropriate documentation/forms to

begin a telecommuting/'work from home' program to accommodate [her] current medical

condition."  Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., June 11, 2012 ("6/11/12, 5:29 p.m.

Email"), ECF No. 46-16 at 67.  Three days later, on June 14, 2012, Lee followed up to see

whether the plaintiff thought the proffered temporary telecommuting accommodation was

satisfactory, Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., June 14, 2012 ("6/14/12, 2:04 p.m.

Email") at 66, ECF No. 46-16, but the plaintiff responded that she had "not received any formal

package yet from Captain Coleman," despite Lee's clear instruction that she should reach out to

Coleman to obtain the package, Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, June 14, 2012

("6/14/12, 3:08 p.m. Email"), ECF No. 46-16 at 66.  Lee offered to "ascertain an update

regarding the application packet" and reiterated that "it is anticipated that the telecommute

initiative would be temporary until the ergonomic assessment was completed."  Pl.'s Opp'n, Ex.

15, Email from Lee to Pl., June 14, 2012 ("6/14/12, 3:22 p.m. Email"), ECF No. 46-16 at 65.  He

also informed the plaintiff that "[t]he securing of the ergonomic assessment is now pending" and

asked her to provide "[a]n update from your doctor regarding your limitations performing your

duties and whether your medical condition is permanent or temporary," as that information still had not been furnished. *Id.* The same day, Lee sent the plaintiff the Telecommuting Application and again informed her that she should send this application to Captain Coleman. Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., June 14, 2012 ("6/14/12, 3:50 p.m. Email") at 57, ECF No. 46-16. The next morning, the plaintiff again asked for the "appropriate forms and/or paperwork" for her reasonable accommodations request. Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, June 15, 2012 ("6/15/12, 10:09 a.m. Email"), ECF No. 46-16 at 65. Almost two weeks later, the plaintiff again requested that Lee "send [her] the form(s) that needs to be completed by the doctors" and, in response, Lee sent over another Reasonable Accommodation Form the same day. Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, June 26, 2012 ("6/26/12, 3:16 p.m. Email"), ECF No. 46-16 at 64–65; Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., June 26, 2012 ("6/26/12, 6:42 p.m. Email"), ECF No. 46-16 at 46.

The next communications took place two months later, on August 28, 2012, when the plaintiff emailed Lee a completed "form from the Workers Compensation doctor regarding Reasonable Accommodations." Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, Aug. 28, 2012 ("8/28/12, 11:16 a.m. Email"), ECF No. 46-16 at 63. In response, Lee asked her to confirm the "date of diagnosis" for her injuries, and the plaintiff clarified that "[t]he diagnosis happened in January 2012," nearly two years after the chair-pulling incident. Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., Aug. 28, 2012 ("8/28/12, 11:43 a.m. Email"), ECF No. 46-16 at 63; Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, Aug. 28, 2012 ("8/28/12, 12:46 p.m. Email"), ECF No. 46-16 at 63. A week later, on September 6, 2012, the plaintiff emailed Lee to ask for an update on the status of her request. Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, Sept. 6, 2012 ("9/6/12, 12:36 p.m. Email"), ECF No. 46-16 at 63. Lee, in turn, asked if she had begun telecommuting, and the

plaintiff replied that she had not. Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., Sept. 6, 2012

("9/6/12, 2:09 p.m. Email"), ECF No. 46-16 at 62; Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee,

Sept. 6, 2012 ("9/6/12, 2:18 p.m. Email"), ECF No. 46-16 at 62. The plaintiff also claimed, in a

later email to a new supervisor, that she had submitted a "request to telecommute for five days"

per week in September 2012. Pl.'s Opp'n, Ex. 15, Email from Pl. to Matthew Bromeland, Apr.

12, 2013 ("4/12/13, 7:54 a.m. Email"), ECF No. 46-16 at 81. She was allegedly informed that

"MPD does not permit 5 days of telecommuting" but that if she submitted a doctor's note stating

that she needed to do so, her request would be honored. *Id.*

On January 28, 2013, the plaintiff wrote to Patrick Burke, MPD's Assistant Chief of the

Homeland Security Division, to "follow up on our meeting of Thursday, January 24, 2013 in

your office concerning my medical reasonable accommodation requests, the temporary solution

suggested by the HR & EEO departments (Telecommuting) and the hostile workplace

environment I have been continually subjected to by Raymond Wickline." Pl.'s Opp'n, Ex. 34,

Email from Pl. to Burke, Jan. 28, 2013 ("1/28/13, 9:18 a.m. Email"), ECF No. 47-19 at 1. The

plaintiff averred that she "submitted a completed Telecommuting form to Mr. Lee's attention" on

September 17, 2012, and that on January 10, 2013, she had been advised to complete additional

telecommuting forms. *Id.* She further stated that on January 15, 2013, she submitted those

forms to Wickline so that he could fill out the supervisor's section, but that on January 17, 2013,

Wickline emailed "all the analysts in [her] unit indicating 'For the time being, there will be no

telecommuting or returning to Districts until further notice.'" *Id.* The plaintiff alerted Burke to

her request to "work five days per week from home," *id.* at 2, and also reiterated concerns about

a hostile work environment that she allegedly raised to Burke in an October 2010 meeting,

including Wickline's habits of "[u]ndermining [her] work performance and personal integrity,"

"[w]ithholding information from [her]," "[c]onstantly keeping [her] out of the loop on data sharing information," "[m]aking insulting or offensive remarks about [her] medical healthcare status," and "[s]tarting, or failing to stop, destructive rumors or gossip amongst [her] coworkers," among other complaints.  *Id.* at 3.

On February 21, 2013, Wickline notified the plaintiff that "[t]he Department is ready to conduct the requested ergonomic assessment for your workspace" and attempted to coordinate a date for the assessments to be completed at both of the plaintiff's workstations.  Pl.'s Opp'n, Ex. 15, Email from Wickline to Pl., Feb. 21, 2013 ("2/21/13, 10:43 a.m. Email"), ECF 46-16 at 79. He also requested a doctor's note clearing her return to work after her scheduled "procedure." *Id.*  The plaintiff and Lee then unsuccessfully attempted to coordinate a date for the assessment, causing the plaintiff to reach out to Diana Haines-Walton, MPD's Director of Human Resources, for assistance and for an update on her telecommuting application.  Pl.'s Opp'n, Ex. 15, Email from Pl. to Haines-Walton, Mar. 4, 2013 ("3/4/13, 12:57 p.m. Email"), ECF No. 46-16 at 77. Haines-Walton informed the plaintiff and Lee that she recommended "tabl[ing] the telecommuting reuquest [sic] until after the assessment," since "the ergonomic assessment will be taking place shortly."  Pl.'s Opp'n, Ex. 15, Email from Haines-Walton to Pl., Mar. 4, 2013 ("3/4/13, 3:57 p.m. Email"), ECF No. 46-16 at 77.  Lee, in turn, informed the plaintiff that he had reached out to the ergonomist for his availability.  Pl.'s Opp'n, Ex. 15, Email from Lee to Pl., Mar. 4, 2013 ("3/4/13, 5:08 p.m. Email"), ECF No. 46-16 at 76.

One week later, on March 11, 2013, the plaintiff again requested an update and, three days later, sent another email to Lee, Haines-Walton, and two other MPD officials detailing her repeated efforts for accommodations and asking Lee to provide her with an update by March 18, 2013.  Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, Mar. 11, 2013 ("3/11/13, 11:10 a.m. Email"),

ECF No. 46-16 at 72; Pl.'s Opp'n, Ex. 15, Email from Pl. to Lee, *et al.*, Mar. 14, 2013 ("3/14/13, 9:22 a.m. Email"), ECF No. 46-16 at 71. In response, Haines-Walton stated that the ergonomic assessment was "imminent" and another MPD official, Jacob Major, notified the plaintiff that Lee had "sent several e-mails in the last few days informing everyone that the EEO Office was waiting for the Ergonomist to provide his available dates." Pl.'s Opp'n, Ex. 15, Email from Haines-Walton to Pl., Mar. 14, 2013 ("3/14/13, 2:57 p.m. Email"), ECF No. 46-16 at 71; Pl.'s Opp'n, Ex. 15, Email from Jacob Major to Pl., Mar. 14, 2013 ("3/14/13, 3:21 p.m. Email"), ECF No. 46-16 at 70–71. Around this time, Matthew Bromeland replaced Raymond Wickline as the plaintiff's supervisor. Pl.'s Opp'n, Ex. 15, Email from Bromeland to Pl., Mar. 15, 2013 ("3/15/13, 10:35 a.m. Email"), ECF No. 46-16 at 70.

The plaintiff's ergonomic assessment was conducted on March 26, 2013. Def.'s SMF ¶ 19 (undisputed); Pl.'s Opp'n, Ex. 25, J. Thomas Pierce Ergonomics Evaluation ("Ergonomic Evaluation"), ECF No. 47-10 at 3. The ergonomist recommended "a more ergonomically adjustable chair," "use of the chair's arm rests," and "provision of a foot rest/support." *Id.* According to the plaintiff's testimony, she received a footstool and an ergonomic keyboard in April 2013. Pl.'s Dep. at 34. The plaintiff accepted a suitable ergonomic chair from Bromeland in the summer of 2013. Def.'s SMF ¶ 21 (undisputed).

### C. Requests for Accommodations after the Initiation of This Lawsuit

This lawsuit was filed on June 21, 2013. On November 12, 2013, the plaintiff submitted an "Application to Participate in Telecommuting Program" requesting to telecommute "4 days a week due to [her] medical condition." Def.'s Mot., Ex. 17, Application to Participate in Telecommuting Program ("Nov. 2013 Telecommuting Appl."), ECF No. 54-1 at 85. The application indicates that Brandy Cramer agreed to this arrangement on behalf of the plaintiff's supervisor, but that approval was still required by the "Agency Head (or designee)." *Id.* at 86,

91. On November 19, 2013, Bromeland allegedly emailed Ms. Pauling "requesting additional information and clarification" related to her doctor's note that "recommended four-days-per-week telecommuting." Def.'s Mot., Ex. 18, Letter from Bromeland to Donna Rucker & Pl., Mar. 14, 2014 ("Bromeland Letter"), ECF No. 54-1 at 94.[4] According to Bromeland, "the only reasoning articulated by the physician in support of telecommuting multiple days per week is that it would allow Ms. Pauling the ability to 'stand and stretch as needed'; both of which can be reasonably accommodated at her work location." *Id.* at 95. Bromeland recommended that the plaintiff provide additional justification for her four-day-per-week request, but he noted that he did not have the authority to grant the plaintiff's telecommuting application and that only the Director of Human Resources could do so. *Id.* Bromeland later stated that he "did not receive a response to [his] email nor did [he] receive any additional information to attach to Ms. Pauling's telecommuting application." *Id.*

In March 2014, Bromeland responded to a letter from the plaintiff's attorney, Donna Rucker. *Id.* at 94. In that letter, Bromeland acknowledged the ergonomist's recommendation that the plaintiff be provided with a footstool, keyboard tray, and ergonomic chair, and he gave an update as to all three items. *Id.* By this time, the plaintiff had received two footstools (one for each of her workstations) and a keyboard tray. *Id.* As for the chair, Bromeland restated the parties' agreement, from June 25, 2013, that "Ms. Pauling would take the report to her physician to assist her in selecting the proper chair for her condition since it would be inappropriate for an individual at MPD to select the chair." *Id.* As of March 2014, however, MPD had not received the plaintiff's selection of a chair. *Id.*[5] Bromeland also indicated that he would resubmit the

---

[4]     The November 19, 2013, email was not entered into the record, but a later letter from Bromeland sent to the plaintiff and her attorney recounts his statements. *See* Bromeland Letter, ECF No. 54-1 at 94–96.
[5]     Elsewhere in the record, the parties agree that "[i]n the summer of 2013, MPD provided Plaintiff with an ergonomic chair, which she accepted." Def.'s SMF ¶ 21 (undisputed).

plaintiff's request for four-day-per-week telecommuting, despite his "humble opinion that it does not provide suitable justification or rationale to support her request to telecommute for four days each week." *Id.* at 95.

The plaintiff apparently did not resubmit her request for telecommuting until August 25, 2015, which request was not immediately conveyed to Saray Leon, the ADA coordinator. Def.'s Mot., Ex. 20, Application to Participate in Telecommuting Program ("Aug. 2015 Telecommuting Appl."), ECF No. 54-1 at 100; Pl.'s Opp'n, Ex. 15, Email from Pl. to Leon, Dec. 1, 2015 ("12/1/15, 1:48 p.m. Email"), ECF No. 46-16 at 84; Pl.'s Opp'n, Ex. 15, Email from Leon to Pl., Dec. 1, 2015 ("12/1/15, 4:07 p.m. Email"), ECF No. 46-16 at 84. On January 19, 2016, the plaintiff submitted a Request for Reasonable Accommodation Form to Leon. Def.'s Mot., Ex. 19, Letter from Leon to Pl., May 19, 2016 ("Leon Letter"), ECF No. 54-1 at 98. Shortly thereafter, on February 16, 2016, the plaintiff's request for one-day-per-week telecommuting was approved by her supervisor and the agency head. Aug. 2015 Telecommuting Appl., ECF No. 54-1 at 106.

On February 29, 2016, the plaintiff and Leon met to "discuss several possible accommodations." Leon Letter, ECF No. 54-1 at 98. On April 6, 2016, the plaintiff identified an ergonomic keyboard and tray for her second workstation, and Leon requested another ergonomic workstation assessment to measure the plaintiff's workstation and ensure that the plaintiff's requested items would fit. *Id.*; Pl.'s Opp'n at 15–16. On May 19, 2016, the plaintiff's request for a second ergonomic keyboard, keyboard tray, and ergonomic assessment was approved. Leon Letter, ECF No. 54-1 at 98. A second ergonomic assessment was conducted in June 2016. Def.'s SMF ¶ 28 (undisputed).

**D.** **The Plaintiff's Absent-Without-Leave Incident in October 2015**

Separately from her failure to accommodate claims, the plaintiff alleges that she "suffered an adverse employment action when she was placed on AWOL [absent without leave]" status in October 2015. Pl.'s Opp'n at 8. This incident arose on October 8, 2015, when the plaintiff informed Cramer, her immediate supervisor, that she would "be out today" on sick leave and provided her timesheet, reflecting sick leave on October 8 and no entry on October 9. Pl.'s Opp'n, Ex. 2, Email from Pl. to Cramer, Oct. 8, 2015 ("10/8/15, 6:38 a.m. Email"), ECF No. 46-4 at 1. The next day, Cramer asked the plaintiff to "advise of [her] status" and forwarded that request to Bromeland. Pl.'s Opp'n, Ex. 6, Email from Cramer to Pl., Oct. 9, 2015 ("10/9/15, 8:34 a.m. Email"), ECF No. 46-8 at 2; Pl.'s Opp'n, Ex. 6, Email from Cramer to Bromeland, Oct. 9, 2015 ("10/9/15, 11:28 a.m. Email"), ECF No. 46-8 at 1. Cramer told Bromeland that she "d[id] not recall giving Yolanda leave today" and that the plaintiff "did not report to work today." 10/9/15, 11:28 a.m. Email, ECF No. 46-8 at 1. Bromeland advised Cramer to "try calling her at least once." Pl.'s Opp'n, Ex. 6, Email from Bromeland to Cramer, Oct. 9, 2015 ("10/9/15, 12:13 p.m. Email"), ECF No. 46-8 at 1. Cramer later reported that she spoke to the plaintiff, who "stated that she thought the policy was she did not need to call everyday she was out" and that "she thought she said she would be out the rest of the week." Pl.'s Opp'n, Ex. 6, Email from Cramer to Bromeland, Oct. 9, 2015 ("10/9/15, 12:19 p.m. Email"), ECF No. 46-8 at 1.

The next week, Cramer advised the plaintiff that she was conducting an investigation "regarding your unauthorized absence on Friday, October 9th," and gave the plaintiff an opportunity to provide a written statement regarding her absence. Pl.'s Opp'n, Ex. 21, Email from Cramer to Pl., Oct. 14, 2015 ("10/14/15, 12:47 p.m. Email"), ECF No. 47-6 at 1. In response, the plaintiff sent Cramer a copy of her timesheet reflecting that she took sick leave all day on October 8 and 9. Pl.'s Opp'n, Ex. 18, Email from Pl. to Cramer, Oct. 16, 2015

("10/16/15, 11:33 a.m. Email"), ECF No. 47-3 at 1. The plaintiff's pay period detail and relevant earnings statement reflect that she was listed as "absent without leave" for five hours on October 9, 2015, and that her pay was reduced accordingly. Pl.'s Opp'n, Ex. 11, Pay Period Detail, ECF No. 46-12 at 1; Pl.'s Opp'n, Ex. 17, Earnings Statement, Oct. 27, 2015 ("Earnings Statement"), ECF No. 47-2 at 1.

On December 3, 2015, Bromeland had a "Resolution Conference" regarding the issue with the plaintiff and her union representative, Kayce Simmons, at which the parties were unable to reach a resolution. Pl.'s Opp'n, Ex. 8, Email from Bromeland to Simmons & Pl., Dec. 15, 2015 ("12/15/15, 6:16 p.m. Email"), ECF No. 48 at 1. On December 15, 2015, Bromeland proposed, as a penalty for the unannounced absence, a one-day suspension held in abeyance for twelve months. *Id.* at 3. It is unclear whether this suspension was ever imposed.

On February 2, 2016, Union President Antonio Reed sent a letter to Commander Jeffrey Carroll requesting reconsideration of the plaintiff's designation as "absent without leave" and her corresponding pay decrease. Pl.'s Opp'n, Ex. 7, Letter from Reed to Carroll, Feb. 2, 2016 ("Reed Letter"), ECF No. 46-9 at 1. Reed noted that "Ms. Pauling immediately acknowledged her error and took full responsibility for her actions on the day in question," *id.*, and requested that MPD "restore Ms. Pauling's pay for October 9, 2015 and use her sick leave balance for the day," *id.* at 3. It is unclear what action was taken to respond to this request.

### E.    Other Employees' Requests for Accommodations

In her Opposition, the plaintiff alleges that "her requests for reasonable accommodations were treated with lower priority than those of her white counterparts" and that her "white colleagues who made similar requests during the same period of time[ ] had their requests honored and processed timely." Pl.'s Opp'n at 33. The plaintiff provided additional facts regarding two specific requests from her white colleagues: she alleges that "when Brandy

Cramer (white, female), requested two ergonomic chairs, she received them within two or three months of her request," *id.* at 34–35, and that "when Tracey Parker (white, female), requested that the office be sanitized because Ray Wickline would bring his dog to work and it aggravated an allergy she had, the entire office was sanitized within a week of her request," *id.* at 36. The plaintiff also claims that several white employees were permitted to telework before the plaintiff and that they "had no problems, no denial, no nothing of anything," but she did not offer specific details about their situations. Pl.'s Dep. at 41–46; *see also* Pl.'s Opp'n at 35.

Regarding Cramer's request, the record shows that on or around June 14, 2010, Cramer sent Haines-Walton a request for reasonable accommodations. Pl.'s Opp'n, Ex. 33, Email from Haines-Walton to Vaughan-Roach, July 15, 2010 ("7/15/10, 1:50 p.m. Email"), ECF No. 47-18 at 5. Cramer requested an update on that request on July 15, 2010, and in response, Vaughan-Roach acknowledged Cramer's doctor's note and asked her to "use the office supply book to select a couple of chairs that you feel may meet your needs." Pl.'s Opp'n, Ex. 33, Email from Vaughan-Roach to Cramer, July 15, 2010 ("7/15/10, 2:44 p.m. Email"), ECF No. 47-18 at 5. On July 19, 2010, Cramer identified a specific chair and provided the name, price, product number, and page of the supply book for that chair. Pl.'s Opp'n, Ex. 33, Email from Cramer to Vaughan-Roach, July 19, 2010 ("7/19/10, 9:24 a.m. Email"), ECF No. 47-18 at 4. Vaughan-Roach approved the purchase of a chair the same day and instructed Wickline and Haines-Walton to order the chair. Pl.'s Opp'n, Ex. 33, Email from Vaughan-Roach to Cramer, July 19, 2010 ("7/19/10, 3:30 p.m. Email"), ECF No. 47-18 at 4.

As to Parker's request, the record reflects that on April 14, 2011, Parker sent Haines-Walton a letter from her doctor regarding her allergy to animal dander, noting that exposure to animal dander would "trigger a serious asthma attack." Pl.'s Opp'n, Ex. 32, Email from Parker

to Haines-Walton, Apr. 14, 2011 ("4/14/11, 5:29 p.m. Email"), ECF No. 47-17 at 3. She

requested that "no personal pets be allowed in the crime analysis office" and that "all of these

affected spaces be cleaned according to common practices/OSHA industry standards associated

with proper dander removal." *Id.* A cleaning crew came and sanitized the office on May 6,

2011. Pl.'s Opp'n, Ex. 32, Email from Sean MacCarthy to Wickline, Apr. 29, 2011 ("4/29/11,

6:36 p.m. Email"), ECF No. 47-17 at 1.

> **F.      The Plaintiff's General Allegations about Her Workplace Environment**

In her deposition, the plaintiff proffered several examples of conduct in her workplace

that she claims are indicative of gender discrimination, race discrimination, disability

discrimination, retaliation, and a hostile work environment. As for race discrimination, the

plaintiff testified that "all [her] white coworkers were able to work from home," Pl.'s Dep. at 42,

and that African-American employees "weren't able to go to training," *id.* at 60. She also

alleged that she once overheard Wickline begin to make a derogatory remark about then-

President Barack Obama, and the plaintiff "started coughing really loud so he would know that I

was there, because he couldn't finish the whole sentence." *Id.* at 61. She further testified that

"[t]here was a swastika picture hanging in front of [Wickline's] office" and that he and another

male colleague "would be right wing" by doing a salute when walking past it. *Id.* Finally, the

plaintiff testified that Wickline "caused a friction" between her and another African-American

woman when he "told the young lady that [the plaintiff] did not like African people" and that she

"was a troublemaker and a problematic person and stay away from me." *Id.* at 61–62.

Regarding gender discrimination, the plaintiff alleges that while "under Mr. Wickline's

supervision, Ms. Pauling was exposed to Mr. Wickline using sexist and bigoted language which

included instances in which he referred to women as 'b—ches' and 'c—ts.'" Pl.'s Opp'n at 3;

Pl.'s Dep. at 59. She stated that Wickline "did not like females," "believed in the all-boy

network," and "did not favor females that were promoted over him." Pl.'s Dep. at 61. He would allow the men in the office to "sit and joke around and talk about women, rating them on their boobs and their looks, the all-boy network." *Id.* at 62. She alleged that this language occurred "pretty much daily" throughout her time under Wickline's supervision, *id.* at 67, and that she complained to Assistant Chief Burke about Wickline's language on October 4, 2011, and in January 2013, *id.* at 69. She also claimed that men were allowed to go to trainings over women. *Id.* at 81.

As for disability discrimination, the plaintiff claims that Wickline "would not fill out the reports timely," *id.* at 24, that Wickline was "calling [her] doctors" and "violating [her] HIPPA right," *id.* at 26, that Internal Affairs "decided that they were not going to do the investigation," *id.*, and that Vaughan-Roach "kept losing the paperwork" and "would not respond to the doctors when they called," i*d.* at 28. She speculated that these delays were also related to her race, her gender, and retaliation against her for submitting an EEO complaint. *Id.* at 34. Similarly, the plaintiff's evidence of retaliation centers on the delays in processing her requests. *Id.* at 73–76. She also alleges that there was "[r]etaliation of me wanting to go to training, retaliation against data sharing information, being in a hostile work environment, being isolated." *Id.* at 77.

### G. Litigation History

After this suit was filed in June 2013, the defendant filed a partial motion to dismiss. That motion sought dismissal of the plaintiff's DCHRA claims based on improper notice under D.C. Code § 12-309 and dismissal of the plaintiff's claims under 42 U.S.C. §§ 1981 and 1983. Def.'s Partial Mot. Dismiss ("Def.'s Mot. Dismiss") at 2, ECF No. 16. In its reply brief in support of that motion, the defendant argued for the first time that the plaintiff's DCHRA claims were procedurally barred because "she already pursued an administrative remedy with the D.C. Office of Human Rights." Def.'s Reply Partial Mot. Dismiss ("Def.'s Mot. Dismiss Reply") at

2, ECF No. 19.  The plaintiff later voluntarily dismissed her claims under §§ 1981 and 1983, and the defendant's motion was denied in all other respects.  *See* Pl.'s Notice of Filing ("Pl.'s Notice") at 1, ECF No. 22; Order (June 15, 2015) ("Mot. Dismiss Order") at 2, ECF No. 24.  As relevant to the pending motion, the defendant's argument that the plaintiff's DCHRA claims were procedurally barred was not addressed by the Court because it was "raised for the first time in a reply brief."  Mot. Dismiss Order at 3.[6]

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Summary judgment is properly granted against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id*. at 323, while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc*. ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'") (quoting *Liberty Lobby*, 477 U.S. at 248); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay

---

[6]     This case was reassigned to the undersigned Judge on October 24, 2017.

27

. . . counts for nothing on summary judgment.") (internal quotation marks omitted); FED. R. CIV. P. 56(c), (e)(2)–(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby*, 477 U.S. at 255). Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal quotation marks omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015). In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal quotation marks omitted); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The

Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III.   DISCUSSION

The plaintiff raises several claims against her employer, including employment discrimination on the basis of race, gender, and disability, in violation of Title VII, the ADA, the Rehabilitation Act, and the DCHRA; retaliation, in violation of Title VII, the ADA, the Rehabilitation Act, and the DCHRA; hostile work environment, in violation of Title VII, the ADA, the Rehabilitation Act, and the DCHRA; and failure to accommodate, in violation of the ADA, the Rehabilitation Act, and the DCHRA. After first addressing the plaintiff's DCHRA claims, the federal claims are taken in turn.

### A.   The Plaintiff's DCHRA Claims Are Procedurally Barred

The defendant first argued that the plaintiff's DCHRA claims are procedurally barred in its reply supporting its partial motion to dismiss. *See* Def.'s Mot. Dismiss Reply at 2. Accordingly, that argument was rejected given the "well established" principle "that district courts need not—and indeed, generally should not—consider arguments raised for the first time in a reply brief" so as to afford the opposing party ample time to respond to the arguments against it. Mot. Dismiss Order at 3. In the pending motion, the defendant renews this argument.

Under District of Columbia law, "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate, unless such person has filed a complaint" with the District's Office of Human Rights. D.C. Code. Ann. § 2-1403.16(a). Thus, individuals bringing DCHRA claims are "offered two possible paths to redress: they may file a complaint either in court or with OHR. In general, they cannot do both." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 32 (D.D.C. 2015) (internal citations omitted). "Indeed, once a

plaintiff files a complaint with OHR, she may only file an independent suit in two narrow instances: if OHR dismissed the case on administrative convenience or if the individual withdrew her OHR complaint before a probable-cause determination was rendered." *Id.* at 33; *see also Carter v. District of Columbia*, 980 A.2d 1217, 1223 (D.C. 2009) ("[T]he jurisdiction of the court and OHR are mutually exclusive in the first instance. Thus, where one opts to file with OHR, he or she generally may not also file a complaint in court.") (internal quotation marks omitted).

It is undisputed that the plaintiff filed a complaint with OHR on December 30, 2010, that the plaintiff did not withdraw that complaint, and that OHR issued its final decision on that complaint on January 3, 2012. *See* Def.'s SMF ¶¶ 1–2 (undisputed); Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 9, ECF No. 43-1; Pl.'s Opp'n at 63–64. The plaintiff nevertheless maintains that the defendant has forfeited any challenge to the DCHRA claims as procedurally barred because according to the plaintiff, this challenge amounts to "an assertion that Plaintiff has brought forth a claim upon which the Court cannot grant her a relief," which, pursuant to Federal Rule of Civil Procedure 12(h)(2), was required to be raised in a motion to dismiss. Pl.'s Opp'n at 64. The plaintiff is mistaken, for two reasons.

First, the plaintiff is incorrect that the defendant's challenge is one that needed to be raised in a motion to dismiss. Instead, this challenge addresses the Court's power to consider the plaintiff's DCHRA claims, and was initially raised as such. Def.'s Reply Mot. Dismiss at 3. Such claims may be raised at any time during the litigation, and "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Given the undisputed facts that the plaintiff elected to file an OHR complaint and that

OHR issued a final determination on that complaint, the plaintiff cannot now seek to pursue those same claims in federal district court.

Moreover, the plaintiff's argument ignores the fact that any concern about the timing of raising this challenge during briefing on the defendant's Motion to Dismiss is no longer present. This jurisdictional argument was previously rejected in order to give the plaintiff time to consider and respond to the defendant's position, raised for the first time in a reply brief. The cases cited by the Court expressly reference the concern that arguments raised for the first time in reply briefs deprive the opposing party of adequate time to consider all the arguments raised against it. Mot. Dismiss Order at 3 (citing *Performance Contracting, Inc. v. Rapid Response Const., Inc.*, 267 F.R.D. 422, 425 (D.D.C. 2010) ("As a general matter, it is improper for a party to raise new arguments in a reply brief because it deprives the opposing party of an opportunity to respond to them, and courts may disregard any such arguments."); *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992) (refusing "to entertain arguments raised for the first time in an appellant's reply brief" because considering such arguments "would be manifestly unfair" to the opposing party and would deprive the court of the benefit of "the adversarial process for sharpening the issues for decision")). In the pending motion, this procedural issue has been squarely raised by the defendant and responded to by the plaintiff and, accordingly, is properly before the Court. *See* Def.'s Mem. at 10–12; Pl.'s Opp'n at 63–64. Summary judgment is therefore granted to the defendant on all of the plaintiff's DCHRA claims. The remaining federal claims are next considered in turn.

### B.   Counts I, III, and V: Employment Discrimination on the Basis of Race, Gender, and Disability

The plaintiff first claims she was the victim of employment discrimination on the basis of race, gender, and disability. These claims must be rejected because the plaintiff has not

established that she suffered an adverse employment action, let alone that such actions were the result of discriminatory animus.

1. *The Plaintiff Has Not Established a Prima Facie Case of Employment Discrimination on the Basis of Race, Gender, or Disability*

In a case involving no direct evidence of discrimination, the court is guided in its analysis of circumstantial evidence by the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), which also applies to claims under the ADA and the Rehabilitation Act, *see Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc) (noting that the *McDonnell Douglas* framework applies to both ADA and Rehabilitation Act claims); *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015).  Under the *McDonnell Douglas* framework, the plaintiff has the burden to establish a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).

Critical to this case is whether the plaintiff suffered an adverse employment action.  An "adverse employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)); *see also Stewart v. Ashcroft,* 352 F.3d 422, 426 (D.C. Cir. 2003) ("[An] [a]dverse employment action . . . [entails a] tangible employment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities." (internal quotation marks omitted)).  An adverse employment action occurs if an employee "experiences materially

adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). "[N]ot everything that makes an employee unhappy," however, "is an actionable adverse action." *Baird*, 662 F.3d at 1250 (quoting *Douglas*, 559 F.3d at 552). Courts have routinely recognized the difference between "purely subjective injuries" on the one hand and "objectively tangible harm" on the other. *See, e.g.*, *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (internal quotation marks omitted). Adverse employment actions must be "significant" and "tangible," and, thus, the Supreme Court has recognized that "in most cases [adverse employment actions] inflict[ ] direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62 (1998). As a result, "[c]ourts applying Title VII have consistently focused on 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating . . . [and not] interlocutory or mediate decisions having no immediate effect upon employment conditions.'" *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997) (quoting *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (en banc).

According to the plaintiff, she suffered adverse employment actions in the form of her "denial of promotions and pay raises," "placement on absent-without-leave status," "denial of training opportunities," "denial of office equipment, which forced Ms. Pauling to take annual leave," and "denial of the opportunity to telework, which also forced Ms. Pauling to take annual leave." Pl.'s Opp'n at 23; *see also id.* at 41, 43, 48–49. None of these actions, however, is "a significant change in employment status," *Baird*, 662 F.3d at 1248 (internal quotation marks omitted), that caused the plaintiff to "experience[ ] materially adverse consequences." *Forkkio*, 306 F.3d at 1131.

As for the alleged denial of promotions and pay raises, the plaintiff has not identified any specific promotion or pay raise that she applied for and did not receive. To the contrary, the plaintiff's own briefing and evidence makes clear that in August 2010, shortly after she had filed her internal EEO complaint, she "was promoted from a Grade 11, Step 3 to a Grade 12, Step 1 as a result of her stellar performance," and that "[i]n 2012, Ms. Pauling was promoted to a Senior Crime Analyst position." Pl.'s Opp'n at 1; *see also* Pl.'s Dep. at 77–79. The record thus belies any claim that she was denied promotions or raises.

Regarding her placement on "absent without leave" status for five hours on October 9, 2015, the plaintiff has not explained how this action amounts to "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Baird*, 662 F.3d at 1248 (internal quotation marks omitted). The plaintiff does not allege that this action affected her working conditions, work performance, benefits, or responsibilities. *See* Pl.'s Opp'n at 41. Moreover, the plaintiff's evidence makes clear that this designation was noted because of her failure to notify her supervisor that she was taking sick leave and, according to her union representative, the plaintiff "immediately acknowledged her error and took full responsibility for her actions on the day in question." Reed Letter, ECF No. 46-9 at 1. In these circumstances, the plaintiff's placement on absent-without-leave status for five hours on a date nearly two years into this litigation does not amount to an adverse employment action.

Next, the mere denial of training opportunities does not constitute an adverse employment action. *See, e.g.*, *Dorns v. Geithner*, 692 F. Supp. 2d 119, 133 (D.D.C. 2010) (finding that the denial of the plaintiff's request to attend four training courses was not an adverse employment action); *Lester v. Natsios*, 290 F. Supp. 2d 11, 29 (D.D.C. 2003) (finding

that the denial of training was not an adverse employment action where it did not "affect[ ] some material change in [the plaintiff's] employment conditions, status or benefits"). To rise to the level of an adverse employment action, the denial of a training opportunity must result in an objectively tangible harm that has "a discernible, as opposed to a speculative, effect on the terms, conditions, or privileges of one's employment." *Edwards v. EPA*, 456 F. Supp. 2d 72, 86 (D.D.C. 2006). Here, the plaintiff has not introduced any evidence of which trainings she was denied, how many trainings are at issue, the topics addressed at these trainings, and how the denial of those trainings affected her employment or employment prospects in any objectively tangible way. Instead, she conclusively asserts that the "denial of training opportunities materially affected the terms, conditions, and privileges of her employment." Pl.'s Opp'n at 7. Without more, this denial does not amount to an adverse employment action.

Finally, regarding the denial of equipment and telecommuting privileges, the plaintiff undisputedly did eventually receive both the requested ergonomic equipment and the right to telecommute. *See* Def.'s SMF ¶¶ 21–22 (undisputed); Pl.'s Dep. at 34–35. While a delay in satisfying these requests might be cognizable as a failure-to-accommodate claim, that delay does not amount to a "significant change" in the plaintiff's employment status and, therefore, is not actionable as an adverse action supporting a discrimination claim. *See Ellerth*, 524 U.S. at 761. Similarly, the fact that these denials required the plaintiff to take annual leave does not, standing alone, materially alter the terms and conditions of the plaintiff's employment and more closely resembles an "interlocutory or mediate decision[ ] having no immediate effect upon employment conditions." *Taylor*, 132 F.3d at 761. The plaintiff does not allege that any requested leave was denied, an action that is more likely to rise to the level of an adverse action. Accordingly,

because the plaintiff has not shown that she suffered any adverse employment action, her claims must be rejected.

> **2.** ***The Plaintiff Has Not Established That MPD's Reasons for Any Adverse Employment Action Were Pretext for Discrimination on the Basis of Race, Gender, or Disability***

Even assuming that the plaintiff had, in fact, suffered an adverse employment action, the plaintiff would fare no better. If the plaintiff had succeeded in establishing a *prima facie* case, the burden would then shift to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. If the employer establishes a legitimate, nondiscriminatory reason, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer intentional discrimination . . . from all the evidence." *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004). In such a case, the court "must resolve one central question," namely, whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee" on a prohibited basis. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

In resolving this central question, courts look to, *inter alia*, "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (internal quotation marks omitted). While the plaintiff need not "submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment," *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (internal quotation marks omitted), the plaintiff must do more than merely state

a disagreement with, or disbelief of, the explanation to satisfy the burden of showing that a reasonable jury could find that the employer's asserted reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.

To "support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, [a plaintiff may cite] the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (citing *Brady*, 520 F.3d at 495 & n.3). To survive summary judgment based solely on evidence of pretext, however, a plaintiff must demonstrate that a "reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason." *Id*. at 1096.

In this case, the only actions that could conceivably be construed as adverse employment actions are the plaintiff's placement on absent-without-leave status, the denial of ergonomic equipment, and the denial of telecommuting privileges—but the defendant has offered legitimate, nondiscriminatory reasons for those actions.[7]  First, the defendant stated the plaintiff was placed on absent-without-leave status because she "failed to report to work for over four hours of her scheduled workday without notifying her supervisor."  Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply") at 10, ECF No. 51.  The defendant further proffered that the delay in providing ergonomic equipment was due to the fact that "Plaintiff was asked several times to

---

[7]  The plaintiff has offered no evidence of any promotions, raises, or trainings that she sought but was denied. Accordingly, the burden of proof never shifted to the defendant to offer legitimate, nondiscriminatory reasons for those alleged actions.  *See McDonnell Douglas*, 411 U.S. at 802.

select a specific ergonomic chair and other workstation equipment" and delayed in identifying specific equipment. *Id.* at 9. Finally, the delay in granting telecommuting privileges was explained by the fact that she "did not submit a telecommuting application until 2013, and she failed to revise that request in response to feedback from her supervisor that he feared the application was inadequate to justify the request." *Id.*

The plaintiff has not established that these reasons were pretext for discrimination on the basis of race, gender, or disability. She first attempts to rebut those reasons by claiming that white employees who requested ergonomic equipment and telecommuting privileges were accommodated relatively quickly. Pl.'s Opp'n at 33–34. As discussed above, however, the plaintiff has provided no details regarding the coworkers that were permitted to telecommute beyond her own assertion that these individuals "had no problems, no denial, no nothing of anything." Pl.'s Dep. at 46. Without more details on the specific circumstances of those individuals and their requests, there is no "relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker*, 798 F.3d at 1092. The only specific evidence proffered by the plaintiff regarding her coworkers relates to Brandy Cramer's request for an ergonomic chair and Tracy Parker's request that the office be sanitized after Wickline brought his dog to work. Pl.'s Dep. at 41–42; Pl.'s Opp'n at 34–36. In those cases, however, the record reflects that, unlike the plaintiff, both Cramer and Parker promptly provided doctors' notes and identified the specific accommodations they were requesting—the exact product name and number of a chair, in Cramer's case, and sanitization of a specific area, in Parker's case. *See supra*, Part I.E; 7/15/10, 2:44 p.m. Email, ECF No. 47-18 at 5; 7/19/10, 9:24 a.m. Email, ECF No. 47-18 at 4; 4/14/11, 5:29 p.m. Email, ECF No. 47-17 at 3. Given these facts, a reasonable

jury would be unable to conclude that the employer's stated reasons were pretext for discrimination.

The plaintiff also challenges the stated legitimate, nondiscriminatory reasons by proffering "independent evidence of discriminatory statements or attitudes on the part of the employer." *Hampton*, 685 F.3d at 1100 (internal quotation marks omitted). Specifically, the plaintiff alleges that she "was the target of male micro-aggressions," Pl.'s Opp'n at 25, and that her supervisor showed "outward disdain and disrespect towards women," *id.* at 26, "would make derogatory statements about other female officials or managers," *id.*, "would make jokes around the office about 'right wing power,'" *id.* at 32, "had a swastika picture posted on his outer office window," *id.*, and "made reference to former U.S. President Barack Obama as a 'black son of a —,'" *id.* The plaintiff does not identify any statements made by her supervisor that show disdain for disabled people. The plaintiff also does not provide any details about when these statements occurred, other than a blanket assertion that they occurred "pretty much daily," Pl.'s Dep. at 67. The proffered statements, while troubling and unprofessional, do not appear to have any relation to the adverse employment actions at issue, if any, and are too "vague" and "conclusory" to avoid summary judgment. *See Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016).

Thus, even if the delay in the provision of equipment and telecommuting privileges did amount to an adverse employment action, the plaintiff has not carried her burden of establishing that the legitimate, nondiscriminatory reasons proffered by the defendant were pretext for race, gender, or disability discrimination.

## C.     Count II: Retaliation

The plaintiff next claims that she suffered "adverse retaliatory actions" that were "a direct result of Plaintiff having previously engaged in protected EEO activity." Compl. ¶ 104. The legal framework for demonstrating retaliation under Title VII is similar to the framework for

establishing discrimination, which also applies to retaliation claims under the ADA and the Rehabilitation Act. *See Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (adopting the Title VII retaliation standard for ADA retaliation cases); *Minter v. District of Columbia*, 809 F.3d 66, 69 (D.C. Cir. 2015) (noting that the Rehabilitation Act incorporates the standards used to evaluate ADA claims). Thus, a prima facie case of retaliation requires a plaintiff to show that "(1) [s]he engaged in protected activity; (2) [s]he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Hamilton*, 666 F.3d at 1357 (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)); *Wiley*, 511 F.3d at 155. Again, "[o]nce the plaintiff has made a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged employment action." *Bright v. Copps*, 828 F. Supp. 2d 130, 142 (D.D.C. 2011) (internal quotation marks and alteration omitted).

The defendant does not dispute that the plaintiff engaged in a protected activity by filing an EEO complaint. *See* Def.'s Mem. at 20. Hence, the critical questions are whether the plaintiff was subjected to an adverse employment action and, if so, whether a causal connection between the protected activity and the alleged adverse action is present. In the retaliation context, adverse actions are "not limited to discriminatory actions that affect the terms and conditions of employment," but instead reach any harm that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Baird*, 662 F.3d at 1249 (quoting *Burlington N. & Santa Fe Ry. Co. v. White* ("*Burlington*"), 548 U.S. 53, 64, 68 (2006)). Such actions include harms that may not be strictly workplace- or employment-related, so long as "a reasonable employee would have found the challenged action materially adverse." *Burlington*, 548 U.S. at 68. Nevertheless, "trivial harms," "petty slights," and "minor

annoyances" do not rise to the level of adverse employment actions, even under the broader retaliation standard. *Id.*

In support of her retaliation claim, the plaintiff states that the "adverse actions in the record that Ms. Pauling testifies to are the denial of promotions and pay raises; her placement on absent-without-leave status ('AWOL'); the denial of office equipment, which forced Ms. Pauling to take annual leave, which is an objectively tangible harm; and denial of the opportunity to telework, which also forced Ms. Pauling to take annual leave, which is an objectively tangible harm." Pl.'s Opp'n at 41. Elsewhere in her brief, the plaintiff also states that she "was ignored by and suffered silent treatment from her supervisor, her assignments have been removed and given to a white, male colleague, she had her training requests denied, and she was given a feces stained chair." *Id.* at 40. Even under the broader definition of adverse actions in the retaliation context, several of the plaintiff's contentions can be flatly rejected. As discussed, the plaintiff's claims of denied promotions and raises lack merit given her multiple promotions and raises, even after she engaged in protected activity. *See* Pl.'s Opp'n at 1; Def.'s SMF ¶ 4 (undisputed). Similarly, although there was a delay in providing the plaintiff with ergonomic equipment and telecommuting privileges, it is undisputed that she eventually received those benefits, even after filing an OHR complaint and initiating this lawsuit. *See* Def.'s SMF ¶¶ 19, 21, 25, 27–28 (undisputed). As for the "silent treatment" the plaintiff claims to have suffered, she admits elsewhere in her brief that "she does not allege that the isolation she experienced was an adverse action." Pl.'s Opp'n at 41. Finally, the plaintiff offers no evidence of which assignments of hers were taken away and given to white, male colleagues or when, and has provided no reason to believe that any such reassignment would amount to anything more than a "petty slight[ ]" or a "trivial harm[ ]." *Burlington*, 548 U.S. at 68.

The plaintiff's best examples of potentially retaliatory actions are her placement on AWOL status and the provision of an allegedly feces-stained chair. Even assuming that these actions amount to materially adverse actions, however, the plaintiff has not established a causal link between her protected activity and these actions. *See Hamilton*, 666 F.3d at 1357–58. As for the AWOL incident, as discussed above, the record evidence establishes that this action was taken due to the plaintiff's failure to communicate regarding her absence on October 9, 2015. *See supra* Part III.B.2. The statements provided by Bromeland and Cramer indicate that they had no knowledge of her whereabouts, and even a statement from the plaintiff's union president indicates that the plaintiff "immediately acknowledged her error and took full responsibility for her actions on the day in question." Reed Letter, ECF No. 46-9 at 1.

Similarly, the record evidence surrounding the soiled chair does not provide any indication that the chair was provided as retaliation. The plaintiff testified that she rejected the first chair because it "had feces on it," Pl.'s Dep. at 35, and that she rejected the second chair because, although she "didn't observe" feces on it, the chair had previously been used by an unhygienic coworker, *id.* at 90–94. Even assuming the veracity of the plaintiff's claims, however, she has failed to offer any evidence of a causal link between Wickline's provision of these chairs and her protected activity. The plaintiff's testimony indicates only that Wickline laughed while he was giving her the first chair and said, "Well, if you take this chair, you've just got to clean it off." Pl.'s Dep. at 35. When Wickline gave her the second chair, he allegedly said, "Here's a chair. Let me give this to you." *Id.* at 36. These statements do not evince any retaliatory intent, and therefore fail to provide the requisite "proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

Moreover, the chairs were provided to the plaintiff in November 2010, after the plaintiff had lodged an internal EEO complaint in June 2010 but before she had filed her OHR complaint or initiated this lawsuit. The lack of temporal proximity between the provision of the chairs and the plaintiff's protected activity—five months—is therefore insufficient to show a causal connection as required by Title VII. *See, e.g.*, *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that a three- or four-month period between protected activity and an adverse action is insufficient to show a causal connection); *Hamilton*, 666 F.3d at 1357 ("[T]emporal proximity can indeed support an inference of causation, but only where the two events are very close in time.") (internal quotation marks omitted). Without any evidence linking the provision of the soiled chairs to the plaintiff's protected activity, the plaintiff's retaliation claim must fail.

### D.      Count IV: Hostile Work Environment

The plaintiff next claims that she was subjected to a hostile work environment. A plaintiff may prevail on a hostile work environment claim if she can show that her employer subjected her to "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)); *see also Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003). The Supreme Court in *Harris* explained that assessing whether a hostile work environment exists has both subjective and objective components. Thus, no violation can be shown "if the victim does not subjectively

perceive the environment to be abusive" and also if the conduct "is not severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris*, 510 U.S. at 21. Further, "a plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard." *Baird*, 662 F.3d at 1252.

In evaluating claims of a hostile work environment, the D. C. Circuit has cautioned that "not all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (internal quotation marks omitted). Rather, there must be a "linkage between the hostile behavior and the plaintiff's membership in a protected class for a hostile work environment claim to proceed." *Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 101 (D.D.C. 2011) (internal quotation marks omitted). The Supreme Court has made it clear that Title VII does not establish a "general civility code for the American workplace," and that "Title VII does not prohibit all verbal or physical harassment in the workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). In other words, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment. *Faragher*, 524 U.S. at 788 (internal quotation marks and citation omitted); *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–16 (4th Cir. 2008) (noting that complaints about mere rude treatment, callous behavior, routine difference of opinion, and personality conflict do not satisfy the severe or pervasive standard of a hostile work environment claim under Title VII). To "prevent[ ] Title VII from expanding into a general civility code," the "crucial" requirement for a hostile work environment claim is that the behavior complained of is "so objectively offensive as to alter the conditions of the victim's employment." *Oncale*, 523 U.S. at 81 (internal quotation marks omitted); *see also Faragher*, 524 U.S. at 788 ("[C]onduct must be extreme to amount to a change in the terms and conditions

of employment."). "Bosses may be harsh, unfair and rude, but conduct so characterized does not necessarily rise to the level of a Title VII violation." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012).

In support of her hostile-work-environment claim, the plaintiff states that her supervisor, Wickline, "consistently walked around the office throwing tantrums, yelling 'that b*tch' in reference to Assistant Chief Diane Grooms who is a woman in upper management at MPD, and [ ] permitted the white males in the office to act with reckless abandon and no consequences." Pl.'s Opp'n at 60. She further alleges that "[g]iven the good ole' boy culture at MPD, white male colleagues of Ms. Pauling have been provided free reign to pass around lewd photos of women and outwardly and explicitly comment on their body parts; [and] hang a swastika in the office." *Id.* Notably, however, the plaintiff offers no evidence that this conduct altered or interfered with the conditions of her employment, and on its own, this conduct is not "sufficiently severe or pervasive to . . . create an abusive working environment." *Harris*, 510 U.S. at 21; *see also Ayissi-Etoh*, 712 F.3d at 577; *Baloch*, 550 F.3d at 1201. Indeed, far more egregious conduct has failed that test. *See, e.g.*, *Baloch*, 550 F.3d at 1195, 1201 (concluding that an employer's threat to have the plaintiff "arrested, led out of the building in handcuffs, and jailed," among other verbal altercations, did not amount to a hostile work environment); *Vickers v. Powell*, 493 F.3d 186, 198–201 (D.C. Cir. 2007) (concluding that a hostile work environment was not created by a supervisor's "angry threats" and derogatory comments about minorities); *Stewart*, 275 F.3d at 1131–33 (holding that a phone call in which a higher-ranked official called the plaintiff "a fucking idiot," among other slurs and profanities, did not create a hostile work environment); *Peters*, 873 F. Supp. 2d at 190 (finding that an employer who "screamed at, talked down to," "pointed her finger" at, "made intimidating comments" to, and "physically blocked"

the plaintiff did not amount to a hostile work environment); *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 51, 56 (D.D.C. 2011) (finding that a supervisor's comments that plaintiff "had skill sets that [he] should not have because if [his] race" and that the plaintiff acted like he was "a nigger from California instead of a nigger from Mississippi" were not sufficiently severe to constitute a hostile work environment).

The plaintiff has cited only isolated statements, none of which was directed at her, to establish her claim, but these statements were "mere offensive utterance[s]" that are not "sufficiently hostile or abusive" to avoid summary judgment. *Faragher*, 524 U.S. at 787–88 (internal quotation marks omitted). Indeed, the plaintiff cites precisely the type of complaints that Title VII's demanding standard is meant to "filter out": "complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* at 788 (internal quotation marks omitted). In the absence of any evidence that Wickline's statements "change[d] [ ] the terms and conditions of [her] employment or "unreasonably interfere[d] with [the plaintiff's] work performance," *id.* (internal quotation marks omitted), her claim of a hostile work environment must be rejected.

### E.     Count VI: Failure to Accommodate

Finally, the plaintiff alleges that the defendant failed to provide a reasonable accommodation of her disability in violation of the ADA and the Rehabilitation Act. Compl. ¶¶ 166–78.[8] The ADA and the Rehabilitation Act prohibit federal agencies from discriminating against disabled individuals and require agencies to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is

---

[8]     The standards used to determine whether the Rehabilitation Act has been violated in a complaint alleging employment discrimination under that Act are the same standards applied in evaluating similar claims under the ADA. *See* 29 U.S.C. § 794(b); *Minter*, 809 F.3d at 69. Accordingly, references to the plaintiff's Rehabilitation Act claims also incorporate her ADA claims, even if not expressly mentioned.

an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship." *Adams v. Rice*, 531 F.3d 936, 943 (D.C. Cir. 2008) (quoting 42 U.S.C. § 12112(b)(5)(A)) (alterations in original); *see also Taylor v. Rice*, 451 F.3d 898, 905 (D.C. Cir. 2006); *Klute v. Shinseki*, 840 F. Supp. 2d 209, 215 (D.D.C. 2012) (quoting *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 82 (D.D.C. 2009)). To survive summary judgment on a failure to accommodate claim, a plaintiff must "come forward with sufficient evidence to allow a reasonable jury to conclude that" she meets four elements: "(i) she was disabled within the meaning of the Rehabilitation Act; (ii) her employer had notice of her disability; (iii) she was able to perform the essential functions of her job with or without reasonable accommodation; and (iv) her employer denied her request for a reasonable accommodation of that disability." *Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014) (internal citations omitted); *Doak v. Johnson*, 798 F.3d 1096, 1105 (D.C. Cir. 2015); *Smith v. Lynch*, 106 F. Supp. 3d 20, 39 (D.D.C. 2015). Notably, "'an employer is not required to provide an employee that accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation.'" *Aka*, 156 F.3d at 1305 (internal quotation marks and alterations omitted).

Here, only the fourth element—whether the employer denied the plaintiff's request for a reasonable accommodation—is at issue. *See* Def.'s Mem. at 21–22. To determine an appropriate reasonable accommodation, the agency should "initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3); *see also Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) ("The process contemplated is 'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'") (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005). "[N]either party should be

able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Ward*, 762 F.3d at 32 (quoting *Sears*, 417 F.3d at 805) (alteration in original). Thus, on summary judgment, courts are instructed to scour the record, *see Alexander v. Wash. Metro. Area Transit Auth.*, 826 F.3d 544, 548–49 (D.C. Cir. 2016) (per curiam), to "look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary," *Ward*, 762 F.3d at 32 (quoting *Sears*, 417 F.3d at 805). "In sum, to establish that her request was 'denied,' [the plaintiff] must show either that the [employer] in fact ended the interactive process or that it participated in the process in bad faith." *Ward*, 762 F.3d at 32.

Here, the plaintiff does not dispute that she eventually received her requested accommodations. *See* Def.'s SMF ¶¶ 19, 21, 25, 27–28 (undisputed). Her chief complaint is that MPD "was unwilling to assist Plaintiff in receiving her reasonable accommodation," Compl. ¶ 172, and that MPD "failed to engage in the interactive process," Pl.'s Opp'n at 53. The history of plaintiff's requests for accommodations and the defendant's various responses, as described *supra* in Part I.A–C, is lengthy. That saga, while protracted, does not show that the defendant "fail[ed] to participate in good faith" or failed "to make reasonable efforts to help [the plaintiff] determine what specific accommodations are necessary." *Ward*, 762 F.3d at 32 (internal quotation marks omitted). Nor does the record reveal that the defendant "ended the interactive process." *Id.* Rather, the defendant appears to have repeatedly attempted to assist the plaintiff with her accommodations by requesting clarification and by informing her of the proper process by which to request her accommodations. *See, e.g.*, 5/10/10, 10:40 a.m. Email, ECF No. 54-1 at 48 (Wickline informing the plaintiff that "[a]ll plans to work from home must be approved by the supervisor ahead of time"); 6/25/10, 10:22 a.m. Email, ECF No. 54-1 at 68 (Lee informing the

plaintiff that an ergonomic assessment was "[her] responsibility to obtain"); 7/16/10, 10:38 a.m.

Email, ECF No. 46-16 at 47 (Lee asking the plaintiff to fill out a Reasonable Accommodation

Request Form "in order to accurately determine what accommodations are needed per your

physician's direction"); 6/11/12, 5:29 p.m. Email, ECF No. 46-16 at 67 (Lee instructing the

plaintiff to "contact Captain Lamont Coleman, the Telecommuting Coordinator, to ascertain the

appropriate documentation/forms to begin a telecommuting/'work from home' program").

On multiple other occasions, MPD employees informed the plaintiff that they were

waiting for her to provide necessary information before proceeding with her requests. *See, e.g.*,

5/10/10, 10:40 a.m. Email, ECF No. 54-1 at 48 (Wickline informing the plaintiff that he was

waiting for forms from her, as well as a copy of her prescription for an ergonomic chair);

5/11/10, 6:38 a.m. Email, ECF No. 54-1 at 50 (Wickline noting that he was waiting for an

indication "of when you plan to return to work," "[a] copy of a Doctor's note clearing you to

return to work," and a plan for what she would accomplish while working from home); 6/11/10,

4:15 p.m. Email, ECF No. 47-21 at 1 (Crane informing the plaintiff that he was waiting for "a

doctor's note specifying what equipment is needed as well as appropriate worker's comp

paperwork clearing the return to work"); 6/25/10, 10:32 a.m. Email, ECF No. 54-1 at 67 (Lee

noting that he was waiting for the plaintiff to obtain an ergonomic evaluation and a doctor's note

indicating the "specific accommodation needed"); 7/19/10, 8:35 a.m. Email, ECF No. 54-1 at 73

(Lee noting that the plaintiff's physician still needed to identify the "actual reasonable

accommodation (i.e. chair, stand etc.)"); 9/17/10, 10:20 a.m. Email, ECF No. 54-1 at 77

(Vaughan-Roach indicating that she was waiting for "official documentation from your doctor

. . . stating the degree of your impairment"); 6/6/12, 11:14 a.m. Email, ECF No. 46-16 at 68 (Lee

indicating he was waiting for the plaintiff to identify "specific items you need for your workstation").

On still other occasions, MPD employees checked in with the plaintiff and offered to help her move the process along. *See, e.g.*, 7/13/10, 3:24 p.m. Email, ECF No. 47-25 at 5 (Lee checking on the status of the plaintiff's ergonomic assessment); 7/14/10, 4:49 p.m. Email, ECF No. 47-25 at 5 (Lee offering to "contact with Human Resources and assist them in carrying out your ergonomic assessment"); 10/3/10, 3:35 p.m. Email, ECF No. 47-17 at 15 (Cramer offering to provide the plaintiff with contact information to obtain a chair); 6/6/12, 11:14 a.m. Email, ECF No. 46-16 at 68 (Lee offering to "re-contact the necessary parties responsible for conducting the ergonomic evaluations"); 6/14/12, 2:04 p.m. Email, ECF No. 46-16 at 66 (Lee checking whether the plaintiff had begun telecommuting); 6/14/12, 3:22 p.m. Email, ECF No. 46-16 at 65 (Lee offering to "ascertain an update" regarding the telecommuting application, despite his instruction that the plaintiff should reach out to Captain Coleman regarding the application).

Taken together, these facts do not show bad faith or a breakdown of the informal, interactive process. *See Ward*, 762 F.3d at 32. The defendant evidently attempted to assist the plaintiff throughout her lengthy attempt to get accommodations, both by advising her and by providing her with the necessary forms. While there were gaps in the chain of events and several delays, the defendant at no point ended the interactive process and, indeed, worked with the plaintiff until she received her requested equipment and was approved for telecommuting. On this record, MPD did not fail to provide a reasonable accommodation for the plaintiff's disability.

## IV.    CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment is GRANTED.

An appropriate Order accompanies this Memorandum Opinion.

Date: December 29, 2017

_____
BERYL A. HOWELL
Chief Judge